UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 18-CR-0138 (PJS/LIB) |
| Plaintiff, | |
| v. | ORDER |
| ALEXANDER LEVI BLACKWELL, | |
| Defendant. | |

Katharine T. Buzicky, UNITED STATES ATTORNEY'S OFFICE, for plaintiff.

Reynaldo A. Aligada, Jr., OFFICE OF THE FEDERAL DEFENDER, for defendant.

Defendant Alexander Blackwell has been charged with various child-pornography offenses. Blackwell has moved to suppress (1) physical evidence obtained as a result of a search of Blackwell's vehicle at the Canadian border by agents of U.S. Customs and Border Protection ("CBP"); (2) statements made by Blackwell to CBP agents on the day of the search; and (3) statements made by Blackwell to an agent of the U.S. Department of Homeland Security ("DHS") more than two years after the search.

This matter is before the Court on Blackwell's objection to the October 30, 2018 Report and Recommendation ("R&R") of Magistrate Judge Leo I. Brisbois. Judge Brisbois recommends denying Blackwell's motions to suppress. The Court has conducted a de novo review. *See* 28 U.S.C. § 636(b)(1); Fed. R. Crim. P. 59(b)(3). Based

on that review, the Court overrules Blackwell's objection, adopts the R&R, and denies the motions.

I. BACKGROUND

On July 4, 2015, Blackwell visited the International Peace Garden, which is located on the border between the United States and Canada near Dunseith, North Dakota. ECF No. 48 at 14-16, 21-22. In order to visit the Peace Garden, Blackwell crossed the border into Canada—and then, following his visit, he attempted to re-enter the United States at the Dunseith Port of Entry. *Id.* at 14-22. At the Port of Entry, Blackwell was subject to a primary inspection, during which a CBP agent searched for Blackwell's name in various databases and discovered that Blackwell was on probation. *Id.* at 22-23, 42-44; Gov. Ex. 7. Pursuant to Dunseith Port of Entry policies, Blackwell was required to submit to a secondary inspection. ECF No. 48 at 22-23, 43-44. That secondary inspection involved a search of Blackwell's vehicle and additional questioning of Blackwell by CBP agents. *Id.* at 23-24, 29-30.

During both the primary and secondary inspections, Blackwell was asked why he had visited the Peace Garden. ECF No. 48 at 26-27. Blackwell first told CBP agents that he had attended a concert featuring his niece, who (he said) was participating in a music camp at the Peace Garden. *Id.* He then changed his story and said that he had

attended a concert featuring a friend.  *Id.*  And then he changed his story again and said that he had attended a concert featuring a friend's daughter.  *Id.*

During the search of Blackwell's vehicle, CBP agents found girls' clothing and an envelope addressed to "HLB" from "ALB" (Blackwell's initials).  ECF No. 48 at 30-31; ECF No. 65 at 11-13.  Inside the envelope,[1] CBP agents found a letter that began "Hello my dearest Hailey."  ECF No. 65 at 15.  CBP agents testified that the letter "was basically a love letter."  ECF No. 48 at 31.

CBP agents contacted the staff at the music camp and asked if they had a camper with the first name "Hailey" and the initials "HLB."  ECF No. 48 at 32-33.  The staff reported that one of their juvenile campers had a matching name and initials.  *Id.*  CBP agents decided to detain Blackwell until he could be questioned by a DHS agent.  *Id.* at 33.  No DHS agents were stationed at the Dunseith Port of Entry, however, so Blackwell was told that he would have to wait for a DHS agent to travel to the Port of Entry.  *Id.* at 35-36.

At this point, Blackwell had been detained for about an hour.  ECF No. 48 at 32-33. DHS Special Agent Randy Helderop arrived about four and a half hours later.  *Id.* at 65.  While Blackwell was waiting for Special Agent Helderop to arrive, Blackwell made one noteworthy statement:  After overhearing CBP agents talking in an adjacent

---

[1]The record is not clear about whether the envelope was sealed or not.  ECF No. 65 at 13-14.  It does not matter for purposes of the Court's analysis.

room about "HLB's" identity, Blackwell spontaneously confirmed her name when a CBP agent later checked on him. *Id.* at 36.

After arriving at the Dunseith Port of Entry, Special Agent Helderop attempted to interview Blackwell, but Blackwell refused to answer any additional questions. ECF No. 48 at 65-69. Special Agent Helderop did, however, interview HLB that evening. *Id.* at 69-73. Based on her statements and the evidence found in Blackwell's vehicle (the girls' clothing, envelope, and letter), law-enforcement agents obtained warrants authorizing the search of other property owned by Blackwell. *Id.* at 74-78. Further incriminating evidence was found during those searches, and Blackwell was charged with two counts of attempted production of child pornography, one count of production and attempted production of child pornography, and three counts of transferring obscene materials to minors. ECF No. 18.

Blackwell was arrested on November 16, 2017 in Union, South Carolina. ECF No. 48 at 85-86, 106. While Blackwell was being transported from Union to Greenville, South Carolina, he was interviewed over the phone by Special Agent Helderop. *Id.* at 86-88, 106-09. Blackwell was given a *Miranda* warning before he spoke to Special Agent Helderop. *Id.* at 110-12; Gov. Ex. 10.

Blackwell now contends that the physical evidence seized at the border—as well as the physical evidence later seized pursuant to the warrants—should be suppressed.

Blackwell also seeks to suppress certain statements that he made to CBP agents on July 4, 2015, and to Special Agent Helderop on November 16, 2017.

II.  ANALYSIS

*A. Physical Evidence Seized During (And as a Result Of) the July 4, 2015 Border Search*

Blackwell's main contention is that the R&R erred in finding that the search of the envelope and letter found in his vehicle was a "routine" border search and thus, like all routine border searches, was "not subject to any requirement of reasonable suspicion, probable cause, or warrant."  *United States v. Montoya de Hernandez*, 473 U.S. 531, 538 (1985).  Blackwell contends that the search of the envelope and letter was not routine in light of federal statutes and regulations, Fourth Amendment case law, and the rationale for the border-search exception to the Fourth Amendment.  Consequently, argues Blackwell, CBP agents were prohibited from searching the envelope and letter without reasonable suspicion that the items were contraband or evidence of criminal activity.

1.  Statutory Authorization

Blackwell initially cites 19 U.S.C. § 482(a) and 19 C.F.R. § 162.7 in support of his argument that searching an envelope found in a vehicle entering the United States at the border is authorized only when there is reasonable cause to suspect that the envelope contains contraband or evidence of criminal activity.  But the provisions cited

-5-

by Blackwell are not specifically addressed to border searches; instead, they apply to searches of envelopes "wherever found" within the United States.[2] Other provisions—specifically, 19 U.S.C. § 1581(a)—provide authority to federal agents to search a "vehicle" at the border, as well as "any person, trunk, package, or cargo on board."[3] *See United States v. Flores-Montano*, 541 U.S. 149, 153 (2004) (finding that § 1581(a) applies to vehicle searches at the border).[4] Section § 1581(a) does *not* require reasonable suspicion. *See* 19 U.S.C. § 1581(a) ("Any officer of the customs may at any time go on board of any vessel or vehicle at any place in the United States or within the customs waters or, as he may be authorized, within a customs-enforcement area established under the Anti-

---

[2]*See United States v. Glasser*, 750 F.2d 1197, 1204 (3d Cir. 1984) (discussing how § 482 "permits customs officials to search persons, vehicles, and packages *even at some distance from the border* when they have reasonable cause to suspect that there is merchandise which was imported contrary to law" (internal quotation marks omitted)). The Supreme Court has never delineated the geographical scope of § 482. In *United States v. Ramsey*, the Supreme Court noted that because the search at issue occurred "at the New York City Post Office as the mail was entering the United States," the Court did not have to "decide whether the broad statutory authority subjects such mail to customs inspection at a place other than the point of entry into this country." 431 U.S. 606, 615-16 n.11 (1977).

[3]The language of § 1581(a) is broad enough to encompass envelopes. *See United States v. Ickes*, 393 F.3d 501, 503-06 (4th Cir. 2005) (interpreting § 1581(a)'s "sweeping" language and concluding that it authorizes a search of a computer and disks at the border, as they were in the traveler's vehicle and constituted "cargo").

[4]*See also Glasser*, 750 F.2d at 1204 (concluding "that the general border search statute is 19 U.S.C. § 1581 and that 19 U.S.C. § 482 is a more specialized statutory provision designed to combat smuggled goods already introduced into the United States"(internal quotation marks omitted)).

Smuggling Act [19 U.S.C. 1701 et seq.], or at any other authorized place, without as well as within his district, and examine the manifest and other documents and papers and examine, inspect, and search the vessel or vehicle and every part thereof and any person, trunk, package, or cargo on board, and to this end may hail and stop such vessel or vehicle, and use all necessary force to compel compliance."). Thus, contrary to Blackwell's contention, no federal statute or regulation requires that a search of an envelope found in a vehicle at the border be supported by reasonable suspicion.

2. Border Search Exception and "Routine" Border Searches

Blackwell concedes that, at the border, "[r]outine searches of the persons and effects of entrants are not subject to any requirement of reasonable suspicion, probable cause, or warrant" under the Fourth Amendment. *Montoya de Hernandez*, 473 U.S. at 538. But, Blackwell contends, the search of an envelope and letter found in a vehicle at the border is *not* routine, and thus must be supported by reasonable suspicion. The case law does not support Blackwell's argument.

Whether a search is routine depends on its intrusiveness.[5] The Supreme Court has cautioned that some "highly intrusive searches of the person" may not be routine and thus may require "some level of suspicion." *Flores-Montano*, 541 U.S. at 152. But the Supreme Court has also made clear that "[c]omplex balancing tests to determine what is a 'routine' search of a vehicle, as opposed to a more 'intrusive' search of a person, have no place in border searches of vehicles." *Id.* That is because "the reasons that might support a requirement of some level of suspicion in the case of highly intrusive searches of the person—dignity and privacy interests of the person being searched—simply do not carry over to vehicles." *Id.* The Supreme Court has suggested that in order for a search of *property* to be so highly intrusive as to be non-routine, the search of the property would have to be destructive. *See id.* at 155-56.

"The Supreme Court has never required reasonable suspicion for a search of property at the border . . . ," *United States v. Touset*, 890 F.3d 1227, 1233 (11th Cir. 2018),

---

[5]*See, e.g., Tabbaa v. Chertoff*, 509 F.3d 89, 98 (2d Cir. 2007) ("The determining factor [in deciding whether a search is routine or not routine] is not how ordinary or commonplace a search is, but rather 'the level of intrusion into a person's privacy.'" (quoting *United States v. Irving*, 452 F.3d 110, 123 (2d Cir. 2006))); *United States v. Okafor*, 285 F.3d 842, 845 (9th Cir. 2002) ("a border search becomes nonroutine only when it reaches the degree of intrusiveness present in a strip search or body cavity search" (internal quotation marks omitted)); *United States v. Uribe-Galindo*, 990 F.2d 522, 525 (10th Cir. 1993) ("Several circuits, including this one, have indicated that the distinction between 'routine' and 'nonroutine' turns to a large extent upon the degree of intrusiveness of the particular type of search."); *United States v. Braks*, 842 F.2d 509, 511 (1st Cir. 1988) ("The degree of invasiveness or intrusiveness associated with any particular type of search determines whether or not that search qualifies as routine.").

and lower courts have consistently found non-destructive searches of personal property to be routine and hence not to require reasonable suspicion (with just a couple of exceptions[6]), *see, e.g., United States v. Oyekan*, 786 F.2d 832, 835 (8th Cir. 1986) ("search of . . . luggage and purses [are] within the scope of routine customs practice unrestricted by the fourth amendment"); *see also Tabbaa*, 509 F.3d at 98 ("[r]outine searches include those searches of outer clothing, luggage, a purse, wallet, pockets, or shoes which, unlike strip searches, do not substantially infringe on a traveler's privacy

---

[6]A couple of the courts of appeals have found non-destructive searches of certain electronic devices—specifically, a laptop computer and a cell phone—not to be routine. *See, e.g., United States v. Kolsuz*, 890 F.3d 133, 147-48 (4th Cir. 2018) (holding that a forensic search of a phone is a non-routine border search requiring some level of individualized suspicion, but declining to decide if that standard is reasonable suspicion or something more—as regardless the good-faith exception applied); *United States v. Cotterman*, 709 F.3d 952, 960-61, 966-68 (9th Cir. 2013) (en banc) (holding that a forensic search of a laptop is a non-routine border search that requires reasonable suspicion, but indicating that a mere cursory search requires no individualized suspicion). *But see Touset*, 890 F.3d at 1233 (stating that it was "unpersuaded" by the courts' decisions in *Kolsuz* and *Cotterman*, and proclaiming that it "see[s] no reason why the Fourth Amendment would require suspicion for a forensic search of an electronic device when it imposes no such requirement for a search of other personal property").

Of note, both *Kolsuz* and *Cotterman* contrasted electronic devices with other personal property. *Kolsuz* explained how "an international traveler can mitigate the intrusion occasioned by a routine luggage search by leaving behind her diaries, photographs, and other especially personal effects," but "the same is not true, at least practically speaking, when it comes to smartphones and digital devices." *Kolsuz*, 890 F.3d at 145. *Cotterman* explained how "[e]ven a car full of packed suitcases with sensitive documents cannot hold a candle to the sheer, and ever-increasing, capacity of digital storage." *Cotterman*, 709 F.3d at 964. Thus, both *Kolsuz* and *Cotterman* implied that border searches of "sensitive documents" such as "diaries"—unlike searches of electronic devices such as laptop computers and cell phones—*would* be routine.

rights"(quoting *Irving*, 452 F.3d at 123)). In light of this case law, this Court agrees that "[a]n envelope containing personal correspondence is not uniquely protected from search at the border." *United States v. Seljan*, 547 F.3d 993, 1003 (9th Cir. 2008) (en banc).

Moreover, contrary to Blackwell's assertions, this Court's holding, like the decisions on which this Court relies, is not inconsistent with anything that the Supreme Court said in *United States v. Ramsey*, 431 U.S. 606 (1977). *Ramsey* addressed the search of an envelope that had been sent to a United States citizen from Thailand; given that the search of the envelope was supported by reasonable suspicion, the Court concluded that the search was authorized under § 482. *Ramsey*, 431 U.S. at 612-16. The Court had no need to address whether, had the search *not* been supported by reasonable suspicion, it nevertheless would have been lawful under § 1581(a) or a similar provision authorizing searches in the absence of reasonable suspicion. *See id.* at 615-16 n.10 ("In light of our conclusion that there existed 'reasonable cause to suspect' a violation of the customs laws, we need not, and do not, decide whether the search would have nonetheless been authorized by other statutory grants of authority urged alternatively upon us by the Government . . . .").[7]

---

[7] In a later case, the Supreme Court explicitly found that § 1581(a)—which does not require reasonable suspicion—authorized a vehicle search at the border. *See Flores-Montano*, 541 U.S. at 153.

After concluding that the search of the envelope was authorized by § 482, *Ramsey* turned to the constitutionality of the search under the Fourth Amendment. The Supreme Court asserted that envelopes sent to the United States via international mail should not receive more Fourth Amendment protection than envelopes that cross the border via other means. *Ramsey*, 431 U.S. at 623. The Court then reasoned that, because envelopes crossing the border via other means are not subject to the Fourth Amendment's warrant or probable-cause requirements, neither were envelopes sent via international mail. *See id.* at 616-23. The Court emphasized the "longstanding" principle "that searches at our borders without probable cause and without a warrant are nonetheless 'reasonable.'" *Id.* at 619.

The Court did not explicitly discuss whether a reasonable-suspicion standard should apply to searches of envelopes crossing the border, but that was unsurprising. At the time that *Ramsey* was decided, the Court had never found that *any* level of suspicion was necessary for *any* border search. Not until eight years later—in *Montoya de Hernandez*—did the Supreme Court find that a highly intrusive search of a human being had to be supported by reasonable suspicion. *Montoya de Hernandez*, 473 U.S. at 540-41. Obviously, then, the *Ramsey* Court would have felt no need to explicitly rule out a standard that it had never applied to a border search.

What's more, the Court explicitly noted in *Ramsey* that it need "not decide whether, and under what circumstances, a border search might be deemed 'unreasonable' because of the particularly offensive manner in which it was carried out." *Ramsey*, 431 U.S. at 618 n.13. The fact that the Court said that it did not need to decide anything about "particularly offensive" border searches clearly indicates that the Court did not believe that the search it was addressing—a search of an envelope and letter—was "particularly offensive" (or, put another way, not routine). *Ramsey* thus provides no support for Blackwell's argument that border searches of envelopes and letters are categorically non-routine.

In short, *Ramsey* expressed the Supreme Court's determination that a search of an envelope and its contents at the border is a routine search for purposes of the border-search exception to the Fourth Amendment. Thus, the search of Blackwell's envelope and letter was lawful, whether or not the CBP agents had reasonable suspicion of contraband or evidence of criminal activity.[8]

---

[8]To the extent that Blackwell contends that the search was not routine due to its duration, the Court disagrees.

First, the Court notes that almost all of the challenged evidence in this case was gathered within the first hour or so of the stop of Blackwell at the border. ECF No. 48 at 22-32, 57-59. A delay of an hour is plainly reasonable. *See Flores-Montano*, 541 U.S. at 155 n.3 ("We think it clear that delays of one to two hours at international borders are to be expected.").

(continued...)

### 3. The Purpose of the Border Search Exception

Blackwell also argues that searching the envelope and letter found in his vehicle was untethered to the purpose of the border-search exception to the Fourth Amendment—that purpose being to enable the government "to regulate the collection of duties and to prevent the introduction of contraband into this country." *Montoya de Hernandez*, 473 U.S. at 537. The Court disagrees. Many forms of contraband (such as child pornography or small amounts of drugs) can be found in an envelope. And many

---

[8](...continued)
The only challenged evidence that was not uncovered within the first hour or so was the spontaneous statement that Blackwell made confirming the victim's name. ECF No. 48 at 35-36. That statement was made sometime between the end of secondary inspection and Special Agent Helderop's arrival—so, at the very most, about five and a half hours after Blackwell was stopped. *See* ECF No. 48 at 32-33, 65. The Court does not believe that this length of time was, in and of itself, sufficient to render the stop non-routine. *See Tabbaa*, 509 F.3d at 100 (finding that "a delay of four, five, or six hours," by itself, does not render a border search non-routine).

But even if the Court is incorrect, at the time that Blackwell made the spontaneous statement, CBP agents *did* have reasonable suspicion to conduct a non-routine search of Blackwell, in light of the conflicting answers given by Blackwell about why he visited the Peace Garden (ECF No. 48 at 27; ECF No. 65 at 8-9); Blackwell's possession of girls' clothing and a "love letter" addressed to "Hailey" in an envelope addressed to "HLB" (ECF No. 48 at 30-31; ECF No. 65 at 10-15); evidence that a juvenile named "Hailey" with the initials "HLB" was attending a music camp at the Peace Garden (ECF No. 48 at 58); and Blackwell's criminal record (ECF No. 48 at 28-29; ECF No. 65 at 7). Taken together, this evidence provided the reasonable suspicion necessary to justify a non-routine border stop.

In sum, no evidence—not even the spontaneous statement—can be said to have been discovered at a time when Blackwell was unlawfully seized.

-13-

forms of contraband (such as plans for a terrorist attack[9] or an "obscene, lewd, lascivious, or filthy . . . paper, letter [or] writing," 18 U.S.C. § 1462(a)) can be discovered by reading a document found in an envelope. Thus, searching an envelope and reading its contents undoubtedly further the purpose of the border-search exception. As one court has explained:

> Although it surely is a discomforting concept, there is no principle beyond the shortness of life and the acknowledgment that there is only so much time available to conduct any particular border search that prevents a CBP officer from reading a diary line by line looking for mention of criminal activity. But in practice, CBP officers are expected to use their discretion to focus on more likely evidence of contraband or criminality—to ensure that what appears to be a diary is not actually *The Anarchist Cookbook*, and to move on.

*United States v. Saboonchi*, 990 F. Supp. 2d 536, 563 (D. Md. 2014) (internal citation and quotation marks omitted).

In sum, the Court finds that CBP agents did not need "reasonable suspicion, probable cause, or [a] warrant" to search the envelope found in Blackwell's car or to read the letter found in that envelope. *Montoya de Hernandez*, 473 U.S. at 538. Blackwell's motion to suppress that evidence is therefore denied.

---

[9] *See* ECF No. 48 at 55-56 (testimony that the "first mission" of officers at the border is protection against terrorism); ECF No. 65 at 73-74 (testimony that the "main mission" of officers at the border is protection against terrorism).

### B. Statements Made at the Border on July 4, 2015

Blackwell next objects to Judge Brisbois's conclusion that various statements that Blackwell made to CBP agents at the border on July 4, 2015 were not obtained in violation of *Miranda* and thus should not be suppressed. The Court agrees with Judge Brisbois.

The Eighth Circuit has held that *Miranda* warnings need not be given at the border "unless and until [1] the questioning agents have probable cause to believe that the person questioned has committed an offense, or [2] the person questioned has been arrested." *Oyekan*, 786 F.2d at 839 n.12 (quoting *United States v. Espericueta-Reyes*, 631 F.2d 616, 622 (9th Cir. 1980)). Blackwell does not seem to argue that CBP agents had probable cause to believe that he had committed an offense at the time that he was interviewed. Instead, Blackwell argues that "he *was* under *de facto* arrest." ECF No. 77 at 14. But, as the Eighth Circuit has held, "detentions during legitimate . . . border searches do not constitute arrests . . . ." *Oyekan*, 786 F.2d at 839 n.12 (quoting *Espericueta-Reyes*, 631 F.2d at 622). There is no doubt that, at least during the primary and secondary inspections, Blackwell was detained during a legitimate border search. Thus, it was not necessary for CBP agents to give Blackwell a *Miranda* warning.

The government has conceded that Blackwell was taken into custody following the secondary inspection, when he was held in a private room to await the arrival of

Special Agent Helderop. ECF No. 75 at 26. The Court is not certain that the government is correct, but it does not matter. Even assuming that Blackwell was in custody following the secondary inspection, he was not subject to "interrogation."

For purposes of *Miranda*, "interrogation" refers both "to express questioning," and "also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980). "[S]ince the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response." *Id.* at 301-02. Accordingly, "*Miranda* does not protect an accused from a spontaneous admission made under circumstances not induced by the investigating officers or during a conversation not initiated by the officers." *United States v. Crisolis-Gonzalez*, 742 F.3d 830, 837 (8th Cir. 2014) (quoting *United States v. Hayes*, 120 F.3d 739, 744 (8th Cir. 1997)).

Here, Blackwell made only one potentially incriminating statement during the period following the secondary inspection: a statement confirming HLB's identity. ECF No. 77 at 14. But Blackwell made this statement spontaneously after overhearing a conversation between CBP officers in the next room. ECF No. 48 at 36. Blackwell did

not offer HLB's name after being asked for it by a CBP officer, nor did any officer do or say anything in Blackwell's presence that was likely to elicit a response. *Id.* Nor is there any reason to believe that CBP officers somehow staged a conversation in the next room in order to elicit a response from Blackwell. Thus, Blackwell was not subject to interrogation at any point when he was arguably in custody, and *Miranda* warnings were not necessary. Blackwell's motion to suppress the statements that he made to CBP agents on July 4, 2015 is therefore denied.

### C. *Statements Made on November 16, 2017*

Blackwell also seeks suppression of statements made to Special Agent Helderop on November 16, 2017 during a telephone interview that was conducted while he was being transported from Union to Greenville. Blackwell relies solely on a fruit-of-the-poisonous-tree argument with respect to those statements. ECF No. 77 at 14-15. Specifically, Blackwell contends that the statements that he made to Special Agent Helderop were made in response to being confronted with evidence that was obtained as a result of the (allegedly) unlawful search at the border in 2015. But the Court has already ruled that the border search was lawful. Without a poisonous tree, there can be no fruit of a poisonous tree. Blackwell's motion to suppress the statements that he made to Special Agent Helderop in 2017 is therefore denied.

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, the Court OVERRULES Blackwell's objection [ECF No. 77] and ADOPTS the October 30, 2018 R&R [ECF No. 76].  IT IS HEREBY ORDERED THAT:

1. Defendant's motion to suppress fruits of an unlawful arrest and search and seizure [ECF No. 36] is DENIED.

2. Defendant's motion to suppress statements [ECF No. 37] is DENIED.

Dated:  December 27, 2018

s/Patrick J. Schiltz_____
Patrick J. Schiltz
United States District Judge